No. 21-1517

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

Naturaland Trust, Upstate Forever, and South Carolina Trout Unlimited,

*Plaintiffs – Appellants,*

v.

Dakota Finance, LLC d/b/a Arabella Farm, Ken Smith, Sharon Smith, and Willard
R. Lamneck, Jr.

*Defendants – Appellees.*
_____

On Appeal from the United States District Court
For the District of South Carolina
_____

**APPELLANTS' OPENING BRIEF**
_____

Michael G. Martinez
Amy Armstrong
Lauren M. Milton
SOUTH CAROLINA ENVIRONMENTAL LAW PROJECT
407 Church Street, Unit E
Georgetown, South Carolina 29440
(864) 527-0078
Mike@scelp.org
Amy@scelp.org
Lauren@scelp.org

**CORPORATE DISCLOSURE STATEMENT**

I certify, pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, that no appellant is in any part a publicly held corporation, a publicly held entity, or a trade association, and that no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation, and the case does not arise out of a bankruptcy proceeding or a criminal case in which there was an organizational victim.

s/ Michael G. Martinez
Michael G. Martinez (Federal Court No. 13431)

October 21, 2021

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................1

Introduction ..........................................................................................6

Jurisdictional Statement ........................................................................7

Statement of Issues ...............................................................................8

Statement of the Case ...........................................................................9

    1.     Statutory and Regulatory Background ...................................9

    2.     Statement of Facts and Evidence .........................................12

    3.     Procedural History ...............................................................19

    4.     The District Court's Rulings ................................................20

Summary of the Argument ....................................................................22

Standard of Review ...............................................................................27

Argument ...............................................................................................27

    I.     **The District Court erred in finding Pickens County and DHEC had commenced and were diligently prosecuting an administrative enforcement action pursuant to a scheme comparable to the Clean Water Act** ..............................................................................27

          A.     Pickens County and DHEC had not commenced and were not diligently prosecuting an administrative enforcement action .......28

B.    The Administrative Enforcement Scheme in South Carolina is not comparable to the Clean Water Act ...........................................38

    a. The Rough Comparability Standard Should be Adopted .......38

    b. South Carolina Fails to Provide Critical Public Participation Mechanisms in Administrative Enforcement Actions ...........40

    c. South Carolina Lacks Adequate Judicial Review of Administrative Enforcement Actions ....................................46

C.    The Diligent Prosecution Bar only Applies to Civil Penalties ....49

II.    **The District Court erred in finding South Carolina Trout Unlimited failed to comply with the notice requirements of the Clean Water Act citizen suit provision** ...........................................................56

III.    **The District Court erred in declining to exercise supplemental jurisdiction over the related state-law claims based on its erroneous conclusion that it lacked subject matter jurisdiction on the Clean Water Act claims** ..................................................................60

Conclusion ...............................................................................63

Request for Oral Argument ...................................................................63

Certification of Compliance ..................................................................64

Certificate of Filing and Service ..........................................................65

# TABLE OF AUTHORITIES

**Pages**

## CASES

*Arkansas Wildlife Federation v. ICI Americas, Inc.*
    29 F.3d 376 (8th Cir. 1994) ............................. 23-25, 29-30, 36-37, 42, 54

*Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*
    166 F.3d 642 (4th Cir. 1999) ................................................................. 27

*Friends of Milwaukee Rivers v. Milwaukee Metro. Sewerage Dist.*
    382 F.3d 743 (7th Cir. 2004) .......................................24, 30, 33-34, 36-37

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*
    629 F.3d 387 (4th Cir. 2011) ........................................................ 56-57, 59

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found. Inc.*
    484 U.S. 49 (1987)............................................................................. 53-54

*Hinson v. Norwest Financial South Carolina, Inc.*
    239 F.3d 611 (4th Cir. 2001) ............................................................ 61-62

*Jones v. City of Lakeland, Tenn.*
    224 F.3d 518 (6th Cir. 2000) ...................................................... 46, 48, 55

*McAbee v. City of Fort Payne*
    318 F.3d 1248 (11th Cir. 2003) ............................................. 28-30, 39, 45

*Natural Resources Defense Council, Inc. v Southwest Marine, Inc.*
    945 F.Supp 1330 (S.D. Cal. 1996) ......................................................... 59

*North Carolina Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC.*
    287 F.Supp.2d 654 (E.D.N.C 2003) ....................................................... 10

*N. & S. Rivers Watershed Ass'n Inc. v. Town of Scituate*
    949 F.2d 552 (1st Cir. 1991)........................................................ 30, 53-54

*Paper, Allied Indust., Chem. & Energy Workers Int'l Union
v. Cont'l Carbon Co.*
    428 F.3d 1285 (10th Cir. 2005) ...........................24, 42, 47, 51-52, 54-55

*Paolino v. JF Realty, LLC*
    710 F.3d 31 (1st Cir. 2013)...................................................... 59

*Piney Run Pres. Assoc v. Cnty. Comms. of Carroll Cnty., Md*
    523 F.3d 453 (4th Cir. 2008) ................................................. 32

*PMC, Inc. v. Sherwin-Williams Co.*
    151 F.3d 610 (7th Cir. 1998) ................................................. 31

*Pub. Interest Research Group of N.J., Inc. v. Hercules, Inc.*
    50 F.3d 1239 (3rd Cir. 1995) ................................................. 57

*Sierra Club v. ICG E., LLC*
    833 F.Supp. 571 (N.D. W. Va. 2011) ...................................... 33

*Stringer v. Town of Jonesboro*
    986 F.3d 502 (5th Cir. 2021) ................................................. 44

*Tobyhanna Conservation Ass'n v. Country Place Waste Treatment Co.*
    734 F.Supp. 667 (M.D. Pa. 1989)............................................ 31

*United Mine Workers of America v. Gibbs*
    383 U.S. 715 (1966)............................................................ 61

*United States v. Smithfield Foods, Inc.*
    191 F.3d 516 (4th Cir. 1999) ............................................40-41

*United States v. Smithfield Foods, Inc.*
    965 F.Supp. 769 (E.D. Va. 1997) ........................................... 42

*United States v. Wilson*
    133 F.3d 251 (4th Cir. 1997) ................................................. 10

*Upstate Forever v. Kinder Morgan Energy Partners, L.P.*
        887 F.3d 637 (4th Cir. 2018) ............................................................ 9, 27

*Waterkeepers N. Cal. V. AG Indus. Mfg., Inc.*
        375 F.3d 913 (9th Cir. 2004) .................................................................. 57

## **STATUTES**

28 U.S.C. § 1291 ........................................................................................8

28 U.S.C. § 1331 ................................................................ 7, 27, 38, 60

28 U.S.C. § 1367(a) ................................................................... 60-61

28 U.S.C. § 1367(c) ...................................................................... 22, 62

28 U.S.C. § 1367(c)(3)................................................................... 60

33 U.S.C. § 1251(a) ........................................................................9

33 U.S.C. § 1311(a) ........................................................................9

33 U.S.C. § 1319(g) ...............................22, 25, 27-28, 30, 34, 39, 41, 50, 52, 54

33 U.S.C. § 1319(g)(4)(a) ........................................................ 42

33 U.S.C. § 1319(g)(6)................................................... 39, 53, 55

33 U.S.C. § 1319(g)(6)(A) ................................................49-51, 53

33 U.S.C. § 1319(g)(6)(A)(ii) .............................. 11, 26, 28, 37, 50-51

33 U.S.C. § 1319(g)(8)................................................................ 46

33 U.S.C. § 1342 ................................................................... 9, 19

33 U.S.C. § 1344 ..................................................................... 19

33 U.S.C. § 1362(6) ............................................................... 10

33 U.S.C. § 1362(12) ........................................................................9

33 U.S.C. § 1362(14) ...................................................................... 10

33 U.S.C. § 1365(a) .................................................................. 11, 54

33 U.S.C. § 1365(a)(1) ........................................................ 11, 27, 50

33 U.S.C. § 1365(b)(1)(B) ................................................... 28, 52, 55

33 U.S.C. § 1365(f)(1) ..................................................................... 11

S.C. Code Ann. § 1-23-350 ............................................................ 47

S.C. Code Ann. § 1-23-380 ............................................................ 48

S.C. Code Ann. § 1-23-600 ............................................................ 47

S.C. Code Ann. § 48-1-10, *et seq.* .................................................9

S.C. Code Ann. § 48-1-10(9) ......................................................... 48

S.C. Code Ann. § 48-1-50 .............................................................. 44

S.C. Code Ann. § 48-1-150 ....................................................... 43-45

S.C. Code Ann. § 48-1-200 ....................................................... 47-49

Pickens County, S.C., Code of Ordinances § 19-33 (2022) ......................... 34

## RULES

Rule 12(b)(1), FRCP ....................................................................... 27

## REGULATIONS

40 C.F.R. § 22.45(b)(1) .............................................................. 43, 47

40 C.F.R. § 122.26(a)(1)(ii) ................................................................ 10

40 C.F.R. § 122.26(b)(14)(x) ............................................................... 11

40 C.F.R. § 122.26(b)(15)(i) ................................................................ 11

40 C.F.R. § 122.26(c)(1) ...................................................................... 10

40 C.F.R. § 122.26(9)(i)(B) .................................................................. 10

40 C.F.R. § 135.3(a) ............................................................................. 56

S.C. Reg. § 61-87(B)(1) ........................................................................ 45

S.C. Reg. § 61-87(B)(3) ........................................................................ 45

S.C. Reg. § 61-56.302 ........................................................................... 45

S.C. Reg. § 72-300 ............................................................................... 34

S.C. Reg. § 72-313 ......................................................................... 34, 43, 46

S.C. Reg. § 72-313(A) .......................................................................... 45

S.C. Reg. § 72-313(A)(4) .................................................................. 35, 44

S.C. Reg. § 72-313(A)(6) .................................................................. 35, 44

S.C. Reg. § 72-313(A)(7) .................................................................. 35, 44

S.C. Reg. § 72-313(A)(8) .................................................................. 35, 44

S.C. Reg. § 72-313(C) ...................................................................... 35, 44

S.C. Reg. § 72-313(Q) ................................................................... 35, 44, 47-48

## **LEGISLATIVE MATERIALS**

H.R. Conf. Rep. No. 1004, 99th Cong., 2d Sess. At 133 (1986) ...................... 51

# INTRODUCTION

This case is about the persistent, egregious violations of the Clean Water Act occurring in a pristine wilderness where brazen disregard of our environmental laws can least be tolerated. Significant damage and significant legal violations persist today on property purchased specifically to protect its ecological value. The right to citizen enforcement granted by the Clean Water Act exists to ensure the public has a mechanism to stop repeated damage to the environment and obtain a remedy for consequences of environmental violations when government enforcement is absent or inadequate. Appellants Naturaland Trust, Upstate Forever, and South Carolina Trout Unlimited sought to exercise their right to citizen enforcement under those exact circumstances.

The unlawful discharges and resulting injuries at issue in this case occurred from construction activities undertaken by Appellees, Dakota Finance, LLC d/b/a Arabella Farm, Ken Smith, Sharon Smith, and Willard R. Lamneck, Jr. (Arabella Farm, collectively). Because of their repeated disregard for the requirements of the Clean Water Act, Arabella Farm discharged literal tons of sediment into one of the most sensitive and recreationally significant waters in South Carolina. The sediment unlawfully discharged from Arabella Farm into these critical tributaries choked valuable water resources, detrimentally affected rare trout that depend on those resources, and caused substantial harm to recreational opportunities.

The District Court dismissed Appellants' claims based on its misinterpretation and misapplication of the "diligent prosecution" bar to citizen suits, finding the private, informal process that occurred between state and local agencies and Arabella Farm constituted "commencement" of a diligent prosecution under a scheme comparable to the Clean Water Act. The District Court's holding prevents Arabella Farm from being held accountable for its environmental violations and eliminates any mechanism for the removal of tons of unlawfully discharged sediment from waterbodies immediately downstream.

The District Court's error resulted in the dismissal of the citizen suit for lack of subject matter jurisdiction. Because this error of law significantly impacts the critical resources at stake and authorizes inadequate state enforcement of Clean Water Act violations, enabling this important legal question to recur, Appellants respectfully request this Court reverse the dismissal and reinstate their claims.

## JURISDICTIONAL STATEMENT

Appellants seek review of the District Court's conclusion that it lacked subject matter jurisdiction over the complaint filed pursuant to the Clean Water Act's citizen suit provision. The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 33 U.S.C. § 1365. The District Court issued a final judgment disposing of all claims on March 31, 2021. (Joint Appendix (J.A.) at 103).

Appellants timely filed the notice of appeal on April 30, 2021. (J.A. at 104). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the District Court erred in applying the diligent prosecution bar to preclude Appellants' citizen suit?

   a. Whether the District Court erred in finding Pickens County and the South Carolina Department of Health and Environmental Control had commenced and were diligently prosecuting an administrative enforcement action at the time Appellants filed their complaint?

   b. Whether the District Court erred in finding South Carolina's administrative enforcement scheme is comparable to the scheme outlined in the Clean Water Act?

   c. Whether the District Court erred in finding the diligent prosecution bar applies to both monetary penalties and injunctive relief?

2. Whether the District Court erroneously dismissed South Carolina Trout Unlimited for failure to comply with the citizen suit notice requirements?

3. Whether the District Court erred in declining to exercise supplemental jurisdiction over related state-law claims based on its erroneous original jurisdiction determination?

## STATEMENT OF THE CASE

I.     <u>Statutory and Regulatory Background</u>

Congress enacted the Clean Water Act (CWA or the Act) to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress intended the CWA to "eliminate the discharge of certain pollutants or 'effluents' into the 'navigable waters' of the United States." *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 642 (4th Cir. 2018), *certiorari granted, judgment vacated on other grounds by* 140 S.Ct. 2736 (2020). Specifically, the CWA prohibits "the discharge of any pollutant by any person" unless conducted in compliance with the Act. 33 U.S.C. § 1311(a).

Section 402 of the CWA established the National Pollutant Discharge Elimination System (NPDES) and authorized the issuance of permits for the discharge of pollutants in certain circumstances. 33 U.S.C. § 1342. The NPDES permit program helps address water pollution by regulating "point sources" that discharge pollutants into waters of the United States. Like many environmental laws, the NPDES program is administered through a cooperative federalism scheme. Pursuant to the authority granted by the Act, South Carolina established a state NPDES permitting program, which is administered by the South Carolina Department of Health and Environmental Control (DHEC). *See* S.C. Code Ann. §§ 48-1-10, *et seq.* In addition, local municipalities often have authority over

stormwater permitting and typically lead the initial "on-the-ground" response to stormwater problems. (J.A. at 32).

Section 402 requires an NPDES permit for the discharge of pollutants. The phrase "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Pollutant" includes "dredged spoil . . . rock, sand, cellar dirt . . . ." *Id.* at § 1362(6); *see United States v. Wilson*, 133 F.3d 251, 259 (4th Cir. 1997) (concluding that "dredged materials, including the native soils excavated by ditching activities may constitute a pollutant within the meaning of the Clean Water Act"); *North Carolina Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC.*, 278 F.Supp.2d 654, 676 (E.D.N.C. 2003) (concluding sediment and its primary components of sand and dirt constitute pollutants under the Act). A "point source" is defined broadly as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." *Id.* at § 1362(14).

In addition to regulating the traditional image of chemical pollution discharging from the end of a pipe, an NPDES permit is required for discharges composed entirely of stormwater when they are associated with industrial activity or small construction activity. 40 C.F.R. § 122.26(a)(1)(ii); 40 C.F.R. §

122.26(9)(i)(B); *see also* 40 C.F.R. § 122.26(c)(1) ("Discharges of stormwater associated with industrial activity and with small construction activity are required to apply for an individual permit or seek coverage under a promulgated storm water general permit."). An *industrial activity* encompasses "construction activity including clearing, grading, and excavation, except operations that result in the disturbance of less than five acres of total land area." *Id.* at § 122.26(b)(14)(x). *Small construction activity* includes "clearing, grading, and excavating that result in land disturbance of equal to or greater than one acre and less than five acres." 40 C.F.R. § 122.26(b)(15)(i). Consequently, the CWA requires an NPDES permit for stormwater management for any construction site that is at least one acre.

The Act authorizes any citizen to "commence a civil action . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation . . . ." 33 U.S.C § 1365(a)(1) (emphasis added). An "effluent standard or limitation" includes an unpermitted discharge. *Id.* at 1365(f)(1). Relatedly, this authority is limited when a State or federal agency has commenced particular administrative enforcement: "[A]ny violation . . . with respect to which a State has commenced and is diligently prosecuting an action under State law comparable to this subsection . . . shall not be the subject of a civil penalty action under . . . Section 1365 of this title." 33 U.S.C. § 1319(g)(6)(A)(ii). The citizen suit

provision authorizes district courts to order injunctive relief to restrain violations and require compliance and to impose monetary penalties. *Id.* at § 1365(a).

## II.     Statement of Facts and Evidence

Arabella Farm conducted its construction activities for its event venue in an area otherwise known for its lack of human disturbance. (J.A. at 62-63, 65). Arabella Farm is located adjacent to the gateway of the Jocassee Gorges: a vast, mountainous wilderness area that is arguably South Carolina's most significant inland environmental resource. (J.A. at 63). Conservation is the most common property usage in the land surrounding Arabella Farm, including properties held by Appellant Naturaland Trust. (J.A. at 62). Naturaland Trust is a nonprofit organization dedicated to the protection of South Carolina's Blue Ridge Mountains, accomplishing its goals by conserving over 100,000 acres in their natural state and open to public use. (J.A. at 22). Naturaland Trust's holdings include two properties, totaling 156 acres, that border the Arabella Farm site. (J.A. at 23). Naturaland Trust purchased these properties to specifically protect the environmental value that Arabella Farm's unlawful stormwater discharges have now impaired. (J.A. at 24).[1]

_____

[1] Upstate Forever and South Carolina Trout Unlimited (SCTU) also serve as Appellants in this case. Upstate Forever, a nonprofit focused on the protection of critical lands, water, and the unique character of the Upstate of South Carolina, seeks to preserve the most important and environmentally sensitive lands. (J.A. at 23). A key component of its work includes protection of resources within the

Abundant, high quality water features are a defining attribute of this portion of the Jocassee Gorges. (J.A. at 62-64). The Arabella Farm site is bounded by three bodies of water: Clearwater Branch, Peach Orchard Branch, and an Unnamed Tributary of the Eastatoe River. (J.A. at 30). The Unnamed Tributary crosses from the site directly onto Naturaland Trust property and flows through protected land to the Eastatoe River, a popular trout fishing destination. (J.A. at 30-31).

In early 2017, Arabella Farm initiated land clearing activities on the site, including mass grading and stripping of the entire site, which exposed its underlying granular soil. (J.A. at 31, 65-66). Aerial images from October 2015, March 2017, and April 2018 show the dramatic alteration of the steep, mountainous landscape committed by Arabella Farm in the course of its construction activities. (J.A. at 65). In all, Arabella Farm cleared an approximately 20-acre portion of their 67-acre property as part of its plan to construct an event venue for weddings, family reunions, and church meetings. (J.A. at 26, 30, 65-66). Arabella Farm claimed the work fell within an "agricultural exemption" to

_____

southern Blue Ridge escarpment, where Upstate Forever holds a conservation easement on the Naturaland Trust properties adjacent to the Arabella Farm site. (J.A. at 23). The easement restricts the use of those properties to preservation of environmental quality. (J.A. at 23-24)

SCTU is a nonprofit organization that seeks to conserve, protect, and restore South Carolina's cold-water fisheries and the watersheds that support them. (J.A. at 24-25) SCTU members act to protect, reconnect, restore, and sustain trout habitat, which relies significantly upon water quality. (J.A. at 24-25).

stormwater permitting and regulation, even initially asserting in land disturbance applications that the "barn" was purely for agriculture and would not have a septic system or other indications of the intended commercial purpose. (J.A. at 31-32).

Because Arabella Farm unilaterally—and without any basis—determined it was exempt from permitting requirements, no sediment or stormwater control measures—designed to prevent or eliminate discharges onto adjacent property or water bodies—were installed on the site. (J.A. at 31-33, 65-66). As a result, significant unlawful discharges of sediment-laden stormwater from the 20-acre site began to occur, causing immediate significant, widespread erosion and detrimental impacts to adjacent waterbodies and property. (J.A. 30, 34, 67-68). The discharges dumped a massive amount of sediment into adjacent streams and rivers, destroying their natural function and features. (J.A. 34, 67-68). This sediment remains downstream of the Arabella Farm site, and no offsite sediment removal or remediation has occurred. (J.A. at 35).

Arabella Farm finally applied for a stormwater permit in early May 2018, more than a year after initiating land disturbance activities, flagrantly misrepresenting the total disturbed area of the site was *only* 2.2 acres. (J.A. at 32, 51-52, 67). Pickens County denied Arabella Farm's application, requesting it address more than twenty issues with the application; Arabella Farm resubmitted applications on June 29, 2018 and January 8, 2019, but Pickens County noted

deficiencies both times. (J.A. at 33, 67). Ultimately, Arabella Farm did not obtain

coverage under a general permit until May 22, 2020, more than three years after it

began clearing and mass grading the mostly forested property. (J.A. at 65-67, 96).

Pickens County issued its first notice of violation and stop-work order on

July 5, 2018 for failure to obtain the required land disturbance, stormwater, and

erosion and sediment control permits. (J.A. at 55). Pickens County subsequently

conducted an inspection on December 20, 2018, photographed the significant

unlawful sedimentation, and informed Arabella Farm of off-site impacts and

requested immediate action to address the discharges. (J.A. at 55-56, 68-69).

Complaints from fishermen triggered involvement by the South Carolina

Department of Natural Resources (DNR). (J.A. at 34). The discharges alarmed

Mark Hall, manager of DNR's Jocassee Gorges property, and he contacted Pickens

County and DHEC on January 2, 2019 requesting assistance because he believed

"the stream has been irreparably damaged and will never recover without some

remedial action" and the "Eastatoee River has been equally devasted." (J.A. at 34).

Pickens County issued its second notice of violation to Arabella Farm on

January 3, 2019, again citing the failure to obtain the required land disturbance,

stormwater, and sediment and erosion control permits and for the discharge of

sediment from the site into waters of the State. (J.A. at 55-56, 68). The notice

indicated the conditions of the prior stop-work order had not been met: "no efforts

have been made to stabilize or control sediment from discharging from your property," and the discharges had impacted an off-site tributary to the Eastatoe River and downstream water bodies. (J.A. at 55-56, 68).

Pickens County conducted subsequent inspections on January 11, 2019, January 22, 2019, February 14, 2019, and March 1, 2019. (J.A. at 69-71). Each inspection documented ongoing unlawful discharges of sediment off-site into the Unnamed Tributary, failing and grossly inadequate stormwater controls, and sandy sediment flowing into tributaries as far downstream as the confluence of the Eastatoe River. (J.A. at 69-71). Additional correspondence between Mark Hall and Pickens County reflected continued transport of "sediment into the lands of adjacent landowners" and worsening erosion on the site. (J.A. at 70). The photographs obtained over those four months demonstrate the drastic impact caused by Arabella Farm's longstanding and continued failure to comply with the requirements of the Act. (J.A. at 69-71).

On April 11, 2019, Arabella Farm and Pickens County entered into its consent order. (J.A. at 51-53, 71). The Pickens County order required only the installation of sod across a particular problem area that drains to the Unnamed Tributary; submission of a site stabilization plan; completion and maintenance of site stabilization measures; and inspections. (J.A. at 52-53). Critically, the consent order failed to require Arabella Farm to obtain necessary NPDES permits, a critical

component for compliance with the CWA. (J.A. at 51-53). The consent order was not intended to ensure compliance with the Act, and Pickens County allowed the site to remain unpermitted and in violation of the Act.

DHEC first engaged on the Arabella Farm site by conducting an inspection on April 12, 2019, the day after Pickens County's consent order was executed. (J.A. at 56). The inspection found numerous deficiencies, including failure to control sediment from leaving the site, significant erosion, off-site impacts observed in both streams where the site drained, and inadequate and unmaintained stormwater controls. (J.A. at 56). Yet, DHEC did not address the offsite impacts, including those on Appellants' property, and very little changed on the site.

Notwithstanding the multiple inspections by multiple agencies informing Arabella Farm of the off-site impacts and the need for effective sediment and stormwater controls, the site continued to lack properly installed and maintained stormwater control measures to prevent sediment-laden discharges. (J.A. at 57). A June 13, 2019 inspection by Pickens County found the same deficiencies relating to the installation and maintenance of stormwater, erosion, and sediment controls, and lack of stabilization. (J.A. at 57). On July 10, 2019, the deadline for Arabella Farm to install all stabilization measures required by the County consent agreement, a Pickens County inspection determined that the same deficiencies

from the prior inspection had not been addressed. (J.A. at 53, 57). Yet another County inspection on August 14, 2019 noted the *same* deficiencies. (J.A. at 57).

DHEC conducted its own inspection on July 22, 2019, noting several deficiencies: the site lacked an approved stormwater plan, stormwater controls required maintenance, inspections performed by Arabella Farm "did not appear to be complete and accurate," and the site was still not stabilized. (J.A. at 57). Approximately one month later, on August 20, 2019, DHEC sent a letter to Arabella Farm, advising that it was required obtain an NPDES permit and instructing it "to cease any activity at the site other than the installation and maintenance of storm water, sediment and erosion control measures as directed by its design engineer." (J.A. at 57). Arguably, this correspondence might be considered the start of informal state agency enforcement. DHEC did not provide any public notice regarding this stop-work order and only Arabella Farm was apprised of this "enforcement action" or allowed to participate.

Arabella Farm responded to DHEC in a September 3, 2019 letter, indicating it had attempted to obtain a permit from Pickens County but elected not to pursue it further because it believed it would be "pointless" when the construction phase was complete. (J.A. at 58). DHEC responded with a letter on September 13, 2019, providing a notice of violation for Arabella Farm's discharge of sediment into the environment, without an NPDES permit, and informing Arabella Farm of a

voluntary, "informal" enforcement conference scheduled for September 25, 2019. (J.A. 54-54, 58-59).

On May 6, 2020—after Appellants' complaint was filed—an administrative order between DHEC and Arabella Farm became effective. (J.A. at 85-95). The order imposed a $6,000 penalty and required Arabella Farm to obtain coverage under an NPDES general permit, submit a stormwater plan and site stabilization plan, and conduct a stream assessment and any recommended remediation. (J.A. at 91-93). Nearly 3 years after it first initiated its construction activities and forty-six days after the filing of the complaint, Arabella Farm obtained coverage under the NPDES general permit for stormwater discharges from Construction Activities on May 22, 2020. (J.A. at 96-97). The downstream sediment has not been removed and the offsite impacts have not been remedied.

III.    Procedural History

Appellants Naturaland Trust and SCTU sent a notice of intent to sue letter on November 14, 2019, to each defendant, the Environmental Protection Agency, DHEC, Pickens County, and the United States Attorney for the District of South Carolina. (J.A. at 61-76).

The requisite sixty-day period elapsed and no regulatory agency had commenced or was diligently prosecuting an enforcement action to redress the CWA violations alleged. Appellants filed the complaint on April 6, 2020, alleging

the ongoing, unpermitted discharge of pollutants at the Arabella Farm site violated the Act as well as closely related state-law claims. (J.A. at 21-48). Specifically, Appellants alleged violations of 33 U.S.C § 1342 for unpermitted discharges from a construction site into waters of the United States, violations of 33 U.S.C § 1344 for placement of fill material without a permit and placement of fill material in violation of a permit,[2] and several state-law claims for private nuisance, public nuisance, trespass and continuing trespass, and negligence and gross negligence. (J.A. at 31-48).

Arabella Farm moved to dismiss, arguing the District Court lacked subject matter jurisdiction because DHEC and Pickens County had commenced administrative enforcement actions and were diligently prosecuting them. (J.A. at 49-50). The District Court granted the motion to dismiss and issued final judgment on March 31, 2021. (J.A. at 5-20, 103). Appellants timely filed the notice of appeal on April 30, 2021. (J.A. at 104).

IV.     The District Court's Rulings

The District Court issued the following three rulings appealed in this case:

**A. Enforcement by Pickens County and DHEC satisfied the Act's diligent prosecution bar.**

---

[2] Appellants do not appeal the District Court's dismissal of the second and third causes of action alleging violations of Section 404 of the Act for placement of fill material in a water of the United States.

The District Court found Pickens County's consent agreement issued on April 11, 2019 and, separately, DHEC's notice of violation issued on September 13, 2019 constituted commencement and diligent prosecution prior to the filing of the complaint on April 6, 2020. (J.A. at 12). The District Court made only a conclusory finding without any examination of statutory or case law defining what enforcement activities rise to the level of "commencement." (J.A. at 12). Next, the District Court concluded the administrative enforcement scheme followed by Pickens County and then DHEC in this case is comparable to the CWA, finding the penalty assessment, judicial review, and public participation provisions were "roughly comparable." (J.A. at 12-17). The District Court incorrectly relied on public notice provisions applicable to the issuance of permits and overlooked the lack of public notice for *enforcement activities*. (J.A. at 12-17).

### B. SCTU failed to comply with the Act's notice requirements.

The District Court further held that SCTU failed to comply with statutory prerequisites for filing a citizen suit because "Trout Unlimited appeared in place of SCTU" in the sixty-day notice letter. (J.A. at 19-20) Acknowledging the notice letter indicated Trout Unlimited had "two local chapters in the Upstate of South Carolina," the Court nonetheless concluded SCTU failed to comply with the Act's notice requirements because of the lack of any "mention of SCTU" in the letter and dismissed its claims. (J.A. at 19-20).

**C. The District Court declined to exercise supplemental jurisdiction over the related state-law claims.**

The District Court relied on the exception to supplemental jurisdiction found in 28 U.S.C. § 1367(c), finding its dismissal of all the federal claims based on the application of the diligent prosecution bar made it appropriate to decline to exercise supplemental jurisdiction over the related state-law claims asserted by Naturaland Trust and Upstate Forever. (J.A. at 20).

## SUMMARY OF ARGUMENT

The District Court erroneously dismissed Appellants' claims that Arabella Farm violated the CWA when it caused repeated, ongoing discharges of pollutants, in the form of stormwater and sediment from the construction site into waters of the United States without an NPDES permit.

More specifically, the District Court erred when it concluded (1) it lacked subject matter jurisdiction over Appellants' citizen suit based on its finding that Pickens County and DHEC had commenced and were diligently prosecuting an administrative enforcement action under a scheme comparable to the Act, (2) SCTU failed to comply with the requisite notice provisions for initiating a citizen suit, and (3) it should not exercise supplemental jurisdiction over the related state-law claims based on its erroneous determination that it lacked original jurisdiction. Appellants respectfully request the reversal of the District Court's dismissal of their CWA claims and their related state-law claims.

# I.

The District Court held that Appellants' citizen suit was precluded pursuant to the diligent prosecution bar set forth in 33 U.S.C. § 1319(g). In doing so, the District Court fundamentally misapplied the diligent prosecution bar and wrongly determined that Pickens County and DHEC's enforcement actions taken prior to the filing of the complaint constituted the commencement of a diligent prosecution under a scheme comparable to the Act.

## A. Commencement and Diligent Prosecution

The District Court's order engaged in only a cursory analysis of when agency action constitutes "commencement" or "diligent prosecution." Instead of evaluating case law defining these two critical terms, the District Court simply concluded without analysis that the Pickens County consent agreement and the DHEC notice of alleged violation amounted to "commencement" and "diligent prosecution" under the Act. Although these terms have not been addressed by the Fourth Circuit, decisions by the Eighth Circuit and the Seventh Circuit indicate that the agencies' enforcement activities relied upon by the District Court fall significantly short of the threshold necessary to bar Appellants' citizen suit.

Specifically, these decisions demonstrate that the type of informal, private enforcement activities that occurred prior to the filing of this case do not have preclusive effect under the Act. *See Arkansas Wildlife Fed'n v. ICI Americas, Inc.*,

29 F.3d 376, 377-78 (8th Cir. 1994); *Friends of Milwaukee Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 756 (7th Cir. 2004). The District Court erred in determining that the agencies' actions prior to the filing of the complaint amounted to commencement and diligent prosecution of the CWA violations alleged by Appellants.

B. Comparability of Enforcement Schemes

The District Court next erred in finding that the agencies' enforcement activities prior to the complaint occurred under a scheme comparable to the Act. The CWA outlines an enforcement process that requires public notice, public participation, and judicial review, and the Act forecloses citizen suits only when a state enforcement process comparably safeguards the rights of the public and affected parties to meaningfully participate in administrative enforcement actions.

The Fourth Circuit has not addressed whether comparability should be assessed under a "rough comparability" or "overall comparability" standard. The District Court applied the "rough comparability" standard, which was the appropriate result. The standard is easier to apply for courts, reduces uncertainty for litigants, agencies, courts, and legislatures, and is consistent with the legislative history of the Act. *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1294 (10th Cir. 2005). Applying this standard, "each category of state-law [administrative enforcement] provisions—penalty

assessment, public participation, and judicial review—must be roughly comparable to the corresponding class of federal provisions." *Id.*

The District Court relied on a significantly flawed analysis by focusing on the presence of comparable public participation and judicial review provisions *somewhere* in DHEC's regulatory scheme and disregarding the fact that those provisions are wholly unrelated to administrative enforcement. The informal, private enforcement scheme typically used by DHEC, including in this case, unequivocally lacks any opportunity for public notice and participation concerning ongoing enforcement actions of environmental statutory and regulatory violations.

Because public notice and participation is not safeguarded at significant stages of the decision-making process, the ability for interested parties, including the public, to seek judicial review is substantially impaired. *See Arkansas Wildlife*, 29 F.3d at 381. Furthermore, South Carolina does not provide any specific judicial review provisions that relate to *enforcement actions*, to the assessment of civil penalties, or a right to intervene in such actions. Appellants respectfully request the reversal of the District Court's decision.

C. Application of Diligent Prosecution Bar to Injunctive Relief

The District Court concluded the diligent prosecution bar precludes *both* monetary and injunctive relief. This conclusion ignores the plain language of the statute and instead misguidedly focuses on the intent behind citizen suits. Section

1319(g) limits the authority granted by the citizen suit provision: "[A]ny violation . . . with respect to which a State has commenced and is diligently prosecuting an action under State law comparable to this subsection . . . shall not be the subject of a *civil penalty action* under . . . Section 1365 of this title." 33 U.S.C. § 1319(g)(6)(A)(ii) (emphasis added).

Appellants submit the plain language of the statute controls and demonstrates Congress's intent to only limit the section 1319 preclusion to citizen suits seeking monetary penalties, but permit citizen suits seeking injunctive relief.

## II.

The District Court separately dismissed claims by SCTU because they were not properly named in the notice letter. In reaching this conclusion, the District Court applied an overly technical and incorrect interpretation of the statutory and regulatory notice requirements. SCTU provided proper notice to Arabella Farm of its intent to sue, the specific violations of the Act alleged, and the requisite contact information regarding the person or entity intending to file suit. SCTU respectfully requests this Court reverse the dismissal of its claims.

## III.

Finally, the District Court erred in dismissing Upstate Forever's and Naturaland Trust's related state-law claims because they form the same case or controversy as the CWA claims over which the District Court validly has original

jurisdiction. Specifically, Naturaland Trust and SCTU satisfied the requirements for a citizen suit, and therefore, federal question jurisdiction. *See* 28 U.S.C. § 1331; 33 U.S.C. § 1365. The District Court's error in finding it lacked original jurisdiction led to its error in declining to exercise supplemental jurisdiction. Therefore, Upstate Forever and Naturaland Trust respectfully request reversal.

## STANDARD OF REVIEW

This Court reviews a district court's dismissal of a complaint for lack of subject matter jurisdiction under Rule 12(b)(1), FRCP, *de novo*. *See Kinder Morgan Energy Partners*, 887 F.3d at 645. "A district court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *Id.* (quoting *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999)).

## ARGUMENT

**I.    The District Court erred in finding Pickens County and DHEC had commenced and were diligently prosecuting an administrative enforcement action pursuant to a scheme comparable to the Clean Water Act.**

The Act authorizes any citizen to "commence a civil action . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation . . . ." 33 U.S.C § 1365(a)(1). Relatedly, section 1319(g) limits this

authority when a State or federal agency has commenced administrative enforcement of violations: "[A]ny violation . . . with respect to which a State has commenced and is diligently prosecuting an action under State law comparable to this subsection . . . shall not be the subject of a [citizen suit]." 33 U.S.C. § 1319(g)(6)(A)(ii).[3]

The section 1319(g) citizen suit bar applies when three requirements are met: (1) the State has commenced an administrative enforcement action against the polluter; (2) the State is diligently prosecuting the enforcement action; and (3) the State administrative enforcement scheme is comparable to section 1319(g). *See McAbee v. City of Fort Payne*, 318 F.3d 1248, 1251 (11th Cir. 2003).

### A. Commencement and Diligent Prosecution of Enforcement Proceeding

The District Court concluded that Appellants' citizen suit was barred based on Pickens County's consent order issued in April 2019 and DHEC's notice of violation issued in September 2019. Notably, DHEC's consent order—the most formal enforcement measure taken by any agency and the only measure actually requiring Arabella Farm to obtain an NPDES permit—was executed after the filing of the complaint.

---

[3] A separate diligent prosecution bar applies for enforcement of violations in court, but no agency here initiated a judicial enforcement action, making that provision inapplicable to this case. *See* 33 U.S.C. § 1365(b)(1)(B).

The CWA does not define "commencement," and the Fourth Circuit has not specifically addressed the issue. Other circuit courts have generally concluded that a formal administrative order qualifies as commencement, but few have analyzed whether enforcement activities short of such an order establish "commencement" of a prosecution. In *Arkansas Wildlife Federation v. ICI Americas, Inc.*, the Eighth Circuit held the agency had commenced an enforcement action when it issued an administrative consent order, which provided interested third parties a right to intervene and triggered certain notice and hearing procedures. 29 F.3d 376, 379-80 (8th Cir. 1994). Importantly, a variety of enforcement activities occurred before the administrative order was issued: (1) the state agency sending notices to the defendant that it was violating pollutant discharge limits under its permit over a two-year period; (2) the state agency's letter informing the defendant it was subject to enforcement action under the state Water and Air Pollution Control Act and requesting a meeting; an (3) a compliance action plan the defendant proposed during the meeting. *Id.* at 377-78. The Eighth Circuit did *not* find the administrative enforcement had commenced based on those informal enforcement activities; instead, the "commencement" of the enforcement action occurred only once the administrative consent order was effective. *Id.* at 380.

Similarly, the Eleventh Circuit agreed that the filing of an administrative consent order would qualify as commencement. *McAbee*, 318 F.3d at 1250-51 n.6.

Unlike Arabella Farm here, the defendant in *McAbee* was operating under the administrative order at the time the plaintiff filed its complaint. *Id.* at 1250. Additionally, the consent order in *McAbee* triggered public notice and opportunity to contest the order like in *Arkansas Wildlife*: specifically, the order required the publication of notice of the consent order in a newspaper of general circulation in the county where the violations occurred and a fifteen-day period for "aggrieved" parties to request a hearing.[4] *Id.* at 1250, 1257; *see also N. & S. Rivers Watershed Ass'n, Inc. v. Town of Scituate*, 949 F.2d 552, 557 (1st Cir. 1991) (concluding the prosecution of an administrative enforcement order issued prior to the complaint was "diligent" but not directly addressing the issue of "commencement").

As reflected in both *Arkansas Wildlife* and *McAbee*, a critical consideration for determining "commencement" of an action is whether the enforcement activities extended beyond private exchanges between the agency and the violator. Consistent with this consideration, the Seventh Circuit held "for the purposes of [section] 1319(g), an administrative action 'commences' at the point when notice and public participation protections become available to the public and interested parties." *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 755-56 (7th Cir. 2004). In contrast, the Court noted "letters and

---

[4] Ultimately, the court in *McAbee* concluded the diligent prosecution bar did not apply because the state's public participation procedures were insufficiently comparable to the CWA. *Id.* at 1256-57.

conferences where no public notice was given and that did not result in hearings have been found not to bar a citizens' suit." *Id.* (citing *Tobyhanna Conservation Ass'n v. Country Place Waste Treatment Co.*, 734 F.Supp. 667, 669-70 (M.D. Pa. 1989) and *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 618-19 (7th Cir. 1998)). The Court ultimately found the citizen suit was not barred by any of the administrative enforcement actions taken prior to the filing of the complaint because none of the "state's administrative enforcement procedures contemplate public notice and participation." *Id.* at 757. In particular, the Court noted several actions that did not qualify as commencement of preclusive enforcement: meetings between the EPA and the state agency, between the state agency and the defendant, and between all three entities; mandatory information requests by the state agency to the defendant; "projects outlined" by the state agency for the defendant to "focus on initially"; and the issuance of a notice of non-compliance. *Id.* at 756. These cases indicate that informal and general correspondence between an agency and a violator does not constitute "commencement" of an enforcement action under the Act.

The issue of whether a prosecution is "diligent" is often intertwined with analysis of its "commencement." The Fourth Circuit has held, in the context of a judicial enforcement action, that a "CWA enforcement action will be considered diligent where it is capable of requiring compliance with the Act and is in good

faith calculated to do so." *Piney Run Pres. Assoc. v. Cnty. Comms. of Carroll Cnty., Md.*, 523 F.3d 453, 460 (4th Cir. 2008). The issue in *Piney Run* centered on whether the state agency had "not diligently prosecuted the County's violations of the thermal limitation set forth in the modified permit." *Id.* at 459. This Court found the enforcement action—specifically, the *judicially approved* consent judgment—was "surely . . . capable of requiring the County to comply with the Act" because it required the County to comply with the thermal limitation of the permit and subjected it to daily monetary penalties if it failed to do so. *Id.* at 460.

Because DHEC's consent order indisputably was not effective until after the filing of Appellants' complaint, the analysis focuses on whether the Pickens County consent order and any DHEC action prior to the filing of the complaint qualifies as commencement and diligent prosecution.

<u>Pickens County Consent Order</u>

This Court should reverse the District Court's finding that the County's consent order issued in April 2019 qualified as commencement or diligent prosecution. First, the District Court's finding that the Pickens County consent order constituted "diligent prosecution" is erroneous because the consent order was incapable of requiring compliance with the specific standards, limitations, or order as our complaint seeks to enforce *See Piney Run*, 523 F.3d at 459 (concluding an

action is "diligent" if it is "capable of requiring compliance" with the CWA and is "calculated to do so").

The Pickens County order required only the installation of sod across an unstable area that drains to the Unnamed Tributary; the submission of a site stabilization plan; completion and maintenance of site stabilization measures; and inspections. (J.A. at 52-53). While these mitigation measures potentially could have reduced the pollutant discharges, "[c]ompliance means an *end* to violations, not merely a reduction in the number or size of them." *Friends of Milwaukee Rivers*, 382 F.3d at 764.

Compliance here would have required Arabella Farm to obtain an NPDES permit, install the stormwater controls approved by that permit, and adhere to its terms and conditions. Instead, the County consent order unequivocally fails to require Arabella Farm to obtain that permit, a critical component for compliance with the Act. *See id.* at 759 (requiring an enforcement action to be "capable of requiring compliance" and "calculated" to require compliance with the Act to be considered "diligent"); *Sierra Club v. ICG E., LLC*, 833 F.Supp.2d 571, 578 (N.D. W. Va. 2011) (finding a draft consent decree was "capable of requiring compliance with the Act" when it required the defendant to "immediately take measures to ensure compliance with all [CWA permit] effluent limits" and imposed "significant" stipulated penalties for violations of effluent limitations or deadlines

for installation, reporting, and compliance). Further, despite the County consent order requiring these minimal mitigation measures, Pickens County and DHEC inspectors found numerous and repeated deficiencies over several months in the installation and maintenance of stormwater and sediment controls. (J.A. at 56-57).

Second, the District Court never considered whether the County's consent order constituted "commencement" in light of the lack of public notice and comment procedures available. *See Friends of Milwaukee's Rivers*, 382 F.3d at 755-56 ("[F]or the purposes of [section] 1319(g), an administrative action 'commences' at the point when notice and public participation protections become available to the public and interested parties."). The County issued its consent order pursuant to state regulations delegating stormwater management and sediment control to local governments and its own ordinance establishing an office tasked with regulating stormwater discharges. (J.A. at 51); *see* S.C. Reg. § 72-300, *et seq.*; PICKENS COUNTY CODE OF ORDINANCES § 19-33.

This enforcement scheme lacks any public notice and public participation protections. *See* S.C. Reg. § 72-313 (authorizing "any person" to request an administrative hearing on a variety of orders issued by the agency but lacking a public notice provision). Indeed, while "any person" may "request" a hearing on a citizen complaint, the issuance of a notice of violation, or the issuance of a stop

work order, no public notice is required. *Id.* at S.C. Reg. §§ 72-313(A)(4),(6), (7), (8); 72-313(C).

The lack of public notice vitiates any opportunity for a member of the public to request a hearing, receive notice of the hearing, be entitled to receive the hearing officer's proposed and final decision, submit an appeal and request oral argument. *See* S.C. Reg. §§ 72-313(D)-(Q). With the lack of public notice and comment procedures available—let alone triggered—the District Court erred in concluding the Pickens County consent order "commenced" an administrative enforcement action under a scheme comparable to the Act.

### DHEC Enforcement Actions

Next, the District Court erred in finding DHEC's actions prior to the filing of the complaint established "commencement" of a prosecution. DHEC initially conducted an inspection on April 12, 2019, noting numerous deficiencies relating to inadequate and unmaintained stormwater controls, sedimentation off-site and downstream, significant erosion, and unstable portions of the site. (J.A. at 56). DHEC provided the inspection report a week later and requested that Arabella Farm "confer with the Pickens County Storm Water Office to determine if the Site requires a permit from Pickens County," implement a plan to stabilize the site, and assess off-site impacts for possible mitigation. (J.A. at 56).

DHEC next notified Arabella Farm via an August 20, 2019 letter that it was required to obtain an NPDES permit and to cease and desist any further activity except for stormwater, sediment, and erosion control measures. (J.A. at 57-58). The letter included a copy of a July 22, 2019 inspection report that found numerous deficiencies: the lack of a stormwater plan, unmaintained stormwater and sediment controls, incomplete and inaccurate inspections performed by Arabella Farm, and the site remained unstable. (J.A. at 57). On September 13, 2019, DHEC sent a "notice of alleged violation/notice of enforcement conference" letter, outlining the alleged violations and scheduling the conference for September 25, 2019. (J.A. at 54-58). The District Court specifically relied on DHEC's issuance of this notice of violation as the "commencement" of prosecution. (J.A. at 12). However, the enforcement conference was a "voluntary, informal meeting" with DHEC staff, offering Arabella Farm the "opportunity to disprove the alleged violations and to present any extenuating information that may mitigate the gravity of the violations." (J.A. at 54, 59). The public did not receive any notice or opportunity to participate in this conference.

The decisions by the Eighth Circuit and the Seventh Circuit in *Arkansas Wildlife* and *Friends of Milwaukee Rivers* demonstrate that notices of violations, meetings, and voluntary compliance plans do not constitute "commencement" of a prosecution. *See Arkansas Wildlife*, 29 F.3d at 377-78 (finding commencement

occurred upon the effective date of the administrative consent order despite prior notices of violation and a voluntary meeting to discuss the violations); *Friends of Milwaukee Rivers*, 382 F.3d at 756 (concluding administrative enforcement had not commenced when the agency had only issued notices of noncompliance, required submission of certain information, and held meetings with the defendant). These decisions establish that "notices of violation" or other enforcement activities like those undertaken by DHEC prior to filing of the complaint are insufficient enforcement activity to satisfy the diligent prosecution bar. *Id.*

Furthermore, DHEC indisputably never provided public notice or an opportunity for public participation at any point during these activities. *See Friends of Milwaukee's Rivers*, 382 F.3d at 755-56 ("[A]n administrative action 'commences' at the point when notice and public participation protections become available to the public and interested parties."). In the absence of public notice of administrative enforcement activities, citizens lose the opportunity to meaningfully participate at significant stages of the administrative enforcement process and the ability to adequately safeguard their substantive interests. *See Arkansas Wildlife*, 29 F.3d at 381. This precise reason explains why these courts have rejected entirely private administrative enforcement activities without any public notice or participation as satisfying the diligent prosecution bar.

The District Court erred in summarily concluding that Pickens County's consent order and DHEC's enforcement actions prior to the complaint constituted commencement and diligent prosecution for purposes of section 1319(g)(6)(A)(ii). Consequently, Appellants' citizen suit complaint is not barred and the District Court has jurisdiction pursuant to section 1365 and 28 U.S.C § 1331.

## B. Comparability of Enforcement Schemes

As an independent ground for reversal, the administrative enforcement scheme used by DHEC and Pickens County is not comparable to the one outlined in the Act—even if Pickens County or DHEC had commenced and diligently prosecuted an enforcement action prior to the complaint.

The District Court concluded that South Carolina state law contains comparable penalty assessment, public participation, and judicial review provisions to the CWA. (J.A. at 12-17). Yet, South Carolina's judicial review and public participation provisions are woefully inadequate—in particular the use of private, informal enforcement procedures that fail to ensure public notice, public comment, or the ability to seek meaningful judicial review of administrative enforcement action.

### a. The Applicable Comparability Standard

The Fourth Circuit has not addressed whether comparability should be assessed under a "rough comparability" or "overall comparability" standard. The

District Court applied the "rough comparability" standard, and this Court should adopt it as well. The standard, established by the Eleventh Circuit in *McAbee*, held that "for state law to be 'comparable,' each class of state-law provisions must be roughly comparable to the corresponding class of federal provisions." 318 F.3d at 1256. Specifically, the standard requires courts to consider whether the state's penalty assessment, public participation, and judicial review provisions are comparable to section 1319(g). *Id.* at 1254.

Prior to announcing the "rough comparability" standard, the Eleventh Circuit analyzed the decisions of several other circuit courts. *Id.* at 1252-54. Although a circuit split exists, the court in *McAbee* outlined compelling reasons for adopting the "rough comparability" standard. *Id.* at 1255-56. Specifically, the Eleventh Circuit concluded that: (1) requiring rough comparability between each class of provisions makes section 1319(g)(6) easier to apply, rather than forcing courts "to weigh incommensurable values"; (2) the rough comparability standard "reduces uncertainty not only for courts but also for potential litigants, state administrative agencies, and state legislatures"; and (3) the "legislative history supports requiring rough comparability between each class of provisions." *Id.*

These reasons demonstrate how the "overall comparability" standard creates uncertainty and allows for potentially arbitrary comparability determinations, increasing the "danger that like cases would not be treated alike." *Id.* at 1255. In

order to ensure clear and consistent application of the comparability requirement of the Act, Appellants respectfully request this Court adopt the rough comparability approach. Applying the standard here requires the examination of comparability of the penalty assessment, public participation, and judicial review provisions utilized by Pickens County and DHEC in its administrative enforcement.[5]

### b. Public Participation

The District Court erred in finding Pickens County and DHEC's enforcement activities provide for public participation in a manner comparable to the Act. (J.A. at 14-16). The provisions relied on by the District Court present significant differences that render its finding of comparability erroneous.

This Court's decision in *United States v. Smithfield Foods, Inc.*, 191 F.3d 516 (4th Cir. 1999) is instructive. There, the EPA initiated an enforcement action pursuant to the Act against Smithfield, which discharged pollutants into waters of the United States. 191 F.3d at 520. Although Smithfield had obtained a permit from both the EPA and the Virginia state regulator, the state regulator subsequently modified the permit, following public review and comment, to require more restrictive terms for a particular pollutant. *Id.* When Smithfield failed to comply with the new standards and the state regulator failed to require compliance with the

---

[5] Appellants do not contest the District Court's finding that the penalty assessment provisions are comparable to the Act.

permit, the EPA initiated an enforcement action against Smithfield for violating its State permit. *Id.* at 523.

Smithfield argued that the EPA enforcement was barred by the Act's diligent prosecution bar in Section 1319(g), but this Court disagreed. 191 F.3d at 524-26. In particular, this Court rejected application of the diligent prosecution bar, finding that Virginia's enforcement scheme was not sufficiently comparable to Section 1319(g) because the state enforcement scheme lacked the Act's public notice and participation safeguards that ensured interested citizens the opportunity to contest administrative actions. *Id.*; *see also United States v. Smithfield Foods, Inc.*, 965 F.Supp. 769, 795 (E.D. Va. 1997), *reversed in part on other grounds*. This Court affirmed the District Court's comparability analysis, which focused on the absence of three main components of public participation from Virginia's enforcement scheme that led to its conclusion that it was not sufficiently comparable to Section 1319(g)—public notice and opportunity to comment regarding a proposed civil penalty, opportunity for the public to request and participate in the administrative hearing, and judicial review of the administrative order. *Smithfield*, 965 F.Supp. at 793-95.

South Carolina's enforcement scheme similarly lacks these three components. First, as to public notice and the opportunity to comment, the District Court erroneously relied on general public notice, comment, and hearing

requirements in South Carolina's environmental regulations for the *drafting and issuance* of permits, not public notice for administrative enforcement actions. (J.A. at 15-16); *see generally* S.C. § Reg. 61-124. These provisions are entirely irrelevant to the informal, private enforcement engaged in by Pickens County, DHEC, and Arabella Farm. The availability of public notice and comment for proposed permits is not the inquiry envisioned by the comparability analysis for enforcement actions. *See Paper, Allied-Indus.*, 428 F.3d at 1294 ("[E]ach category of state-law provisions—penalty assessment, public participation, and judicial review—must be roughly comparable to the *corresponding class of federal provisions*." (emphasis added)). The section 1319 diligent prosecution bar applies when a state or federal agency has engaged in administrative enforcement; whether the public receives notice of a hearing on an application for a permit lacks any bearing on whether the public is provided a "meaningful opportunity to participate at significant stages of the decision-making process" and has the ability to "adequately safeguard[] their legitimate substantive interests" during the *administrative enforcement process*. *Arkansas Wildlife*, 29 F.3d at 381.

Second, the laws and regulations cited by the District Court relating to actual enforcement notably allow citizens to file complaints regarding violations and *request* hearings, but this is distinctly different than what is required by the CWA. (J.A. at 14-15); *see* 33 U.S.C. § 1319(g)(4)(a) ("Before issuing an order *assessing*

*a civil penalty* under this subsection the Administrator or Secretary . . . *shall provide public notice of and reasonable opportunity to comment* on the proposed issuance of such order." (emphasis added)); 40 C.F.R. § 22.45(b)(1) (describing the requirements and parameters of public notice prior to the assessment of a civil penalty). In contrast, the South Carolina regulations cited by the District Court as comparable presume precisely the essential component required by the Act—public notice. *See* (J.A. at 15); S.C. Code. Ann. § 48-1-150 (authorizing DHEC to hold public hearings "of its own volition or upon the request of affected persons" when DHEC issues an order or determination in several instances involving the discharge of pollutants into the environment but lacking any public notice); S.C. Reg. § 72-313 (authorizing "any person" to request an administrative hearing on a variety of orders issued by the agency but lacking a public notice provision).

Indisputably, no public notice was provided of Pickens County's July 5, 2018 notice of violation and stop-work order, its January 3, 2019 second notice of violation, its April 11, 2019 consent agreement, DHEC's August 20, 2019 letter informing Arabella Farm it needed an NPDES permit, DHEC's September 13, 2019 "notice of alleged violation/notice of enforcement conference" letter, or the September 25, 2019 enforcement conference. (J.A. at 54-58). Therefore, neither Appellants nor any other member of the public was notified of the enforcement activities undertaken by Pickens County and DHEC. Without question,

enforcement activities occuring without any public notice cannot provide a reasonable opportunity for the public to participate or comment. As a result, the right for "any person" to request a hearing on a citizen complaint, the issuance of a notice of violation, the issuance of a stop work order, or orders for the discontinuance of discharge of waste into the environment, becomes entirely meaningless. *Id.* at S.C. Reg. §§ 72-313(A)(4),(6), (7), (8); 72-313(C).

This lack of public notice vitiates any opportunity for an affected member of the public to request a hearing, receive notice of the hearing, be entitled to receive the hearing officer's proposed and final decision, submit an appeal and request oral argument. *See* S.C. Code Ann. §§ 48-1-50, 48-1-150 S.C. Reg. §§ 72-313(D)-(Q). None of the provisions of state law cited by the District Court enable the public or an affected person to obtain notice of any of these actions, rendering any right to hearings or judicial review hollow.

Without this requisite public notice, South Carolina's enforcement scheme cannot be considered "comparable" to the Act. *See Stringer v. Town of Jonesboro*, 986 F.3d 507-08 (5th Cir. 2021) (finding a state law not comparable when it "provide[d] no formal or structured means for interested citizens to become aware of [the state agency's] enforcement efforts, nor any mechanism by which they can call for further action, involve themselves in related or ongoing proceedings, or otherwise weigh in on those efforts"). Moreover, as the Eleventh Circuit noted,

"[a] right to pre-order participation is markedly different from the right to post-decision participation. In pre-order proceedings, an agency has not hardened its position, and interested persons are not subject to the same technical pleading requirements or burdens of proof that are imposed once the state has issued an order." *McAbee*, 318 F.3d at 1257. The record here contains no evidence of the opportunity for "pre-order participation" by Appellants or other affected members of the public.

Exacerbating this lack of public notice, administrative hearings cannot even be *requested* for administrative consent agreements, like the one relied upon by the District Court; consequently, a member of the public could theoretically obtain notice of the consent agreement yet have no recourse for challenging it. *See* S.C. Code Ann. § 48-1-150; S.C. Reg. § 72-313(A).

As another example, while the regulations relating to violations and penalties for *underground injection control* require DHEC to investigate all citizen complaints and "*publish notice of and provide at least 30 days for public comment on any proposed settlement of a State enforcement action,*" no equivalent provision is found anywhere in South Carolina's regulations concerning water quality, pollution control, or sediment reduction. S.C. Reg. §§ 61-87.16(B)(1) and (3) (emphasis added); *see also* S.C. Reg. § 61-56.302 (authorizing the Department to assess civil penalties for violations of onsite wastewater system regulations but

lacking any public notice and comment requirements); S.C. Code Ann. § 48-14-140 (authorizing civil penalties for violation of land disturbing laws and regulations but lacking any public notice and comment requirement); S.C. Reg. §§ 72-313 to 72-315 (same).

These substantial differences between the public's right to involvement in the administrative enforcement undertaken here and the procedures outlined in the CWA demonstrate the District Court's error in finding that the enforcement scheme in South Carolina is comparable to the Act. The failure of South Carolina's public participation provisions to "afford[] interested and/or adversely affected citizens the safeguard of a meaningful opportunity to participate in the administrative enforcement process" further exacerbates citizens' ability to seek judicial review. *Jones v. City of Lakeland, Tenn.*, 224 F.3d 518, 523 (6th Cir. 2000). Appellants respectfully request this Court reverse the District Court's finding of comparability in South Carolina's public participation provisions.

### c. Judicial Review

The District Court also concluded that South Carolina has a comparable judicial review provision. (J.A. at 16). The CWA provides judicial review to "[a]ny person against whom a civil penalty is assessed . . . or who commented on the proposed assessment of such penalty" in accordance with the public notice and participation provisions. 33 U.S.C. § 1319(g)(8).

The public participation provisions relating to administrative penalty actions under the Clean Water Act "provides for public participation in three ways: (1) a reasonable notice and opportunity to comment before the issuance of the proposed order assessing a civil penalty; (2) the right to present evidence if a hearing is held; and (3) the right to petition for a hearing if one is not held." *Paper, Allied-Indus.*, 428 F.3d at 1295; *see also* 40 C.F.R. § 22.45(b)(1) (requiring public notice to be provided within thirty days after a complaint is issued but forty days before a penalty is assessed).

In contrast, in South Carolina, "Any person may appeal from any order of the Department within thirty days after the filing of the order, to the court of common pleas of any county in which the pollution occurs." S.C. Code Ann. § 48-1-200. As discussed above, South Carolina lacks any adequate public notice and participation provisions that enable effective and meaningful judicial review of an administrative enforcement order. Although a final order after administrative hearings may be appealed to the administrative law court, only a "party" to the administrative hearings—which necessarily would include only persons who had notice of the enforcement and requested the hearings—will receive notice of the final decision. *See* S.C. Reg. § 72-313(Q); S.C. Code Ann. § 1-23-350; S.C. Code § 1-23-600. The near impossibility for a member of the public to receive notice regarding a stormwater or sediment discharge violation—and pursue

administrative hearings—impedes the availability and effectiveness of judicial review. *See id.* S.C. Reg. §§ 72-313(D)-(Q).

Furthermore, the judicial review in section 48-1-200 relied upon by the District Court is triggered only "after the *filing* of the order." (emphasis added); *see Jones*, 224 F.3d at 523-24 (concluding the public is "denied access to both the courts and to a meaningful opportunity to participate at significant stages of the administrative decision-making process" when the state statute granting judicial review of a consent judgment between the agency and the polluter "presupposes that a final order . . . has been filed with the chancery court as a condition precedent to invoking its jurisdiction").

The District Court's reliance on section 48-1-200 is additionally problematic for multiple other reasons highlighted by the prior discussion on commencement and diligent prosecution. First, DHEC did not issue its administrative consent order until *after* the filing of the complaint. Second, section 48-1-200 does not apply to Pickens County's consent order as it was not "an order of the Department." *See id.*; S.C. Code Ann. § 48-1-10(9) (defining the "Department" as "the Department of Health and Environmental Control"). Lastly, none of the other investigative or enforcement activities engaged in by DHEC, such as the letters, notice of violation, or the voluntary enforcement conference, constituted an "order of the Department." *Id.* at § 48-1-200. Finally, the District Court additionally cited to section 1-23-380

as another avenue of judicial review. Section 1-23-380 grants judicial review to a "party who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case." This section suffers the same problems as section 48-1-200. The "final decision" by DHEC in this case only occurred after the filing of the complaint, which again serves to demonstrate that DHEC had not commenced or diligently prosecuted an administrative enforcement action.

The District Court's ruling effectively allows South Carolina to prevent public participation and enforcement of CWA violations: the public cannot obtain notice of violations or stop-work orders, impeding the ability to request hearings and safeguard their substantive interests prior to an order, and only final orders of DHEC that are filed trigger judicial review. South Carolina's judicial review provisions deny the public access to the courts and to meaningfully participate in the administrative process, and Appellants request reversal of the District Court.

## C. Application of Diligent Prosecution Bar to Injunctive Relief

As discussed above, the District Court erred in finding Pickens County and DHEC's enforcement activities satisfied the diligent prosecution bar and precluded Appellants' citizen suit. This Court should nonetheless reverse the dismissal of Appellants' claims for injunctive relief, even if the District Court's ruling regarding the diligent prosecution bar is affirmed, because the unambiguous

statutory language of section 1319(g)(6)(A) only precludes claims for monetary penalties.

The District Court only briefly discussed in a footnote whether section 1319(g)(6)(A) bars both monetary and injunctive relief. (J.A. at 17 n.12). The District Court's flawed analysis ignored the plain language of the statute and instead focused on the intent behind citizen suits. *Id.*

The citizen suit provision authorizes citizens to "commence a *civil action*" for both injunctive relief and monetary penalties. 33 U.S.C § 1365(a)(1) (emphasis added). However, Section 1319(g) limits this authority: "[A]ny violation . . . with respect to which a State has commenced and is diligently prosecuting an action under State law comparable to this subsection . . . shall not be the subject of a *civil penalty action* under . . . Section 1365 of this title." 33 U.S.C. § 1319(g)(6)(A)(ii) (emphasis added). These two provisions make clear that an administrative enforcement action satisfying the diligent prosecution bar precludes only citizen suit claims for civil penalties. Accordingly, the plain language of the statute provides that the District Court retains jurisdiction to consider Appellants' claims for injunctive relief.

This conclusion is bolstered by the fact that Pickens County and DHEC's enforcement activities prior to the filing of the complaint were incapable of accomplishing the primary injunctive relief sought by Appellants. In particular,

none of the enforcement actions undertaken by Pickens County and DHEC prior to the complaint sought to address the consequences of Arabella Farm's numerous violations of the Act—the tons of sediment residing in waterbodies downstream of Arabella Farm. (J.A. at 35). The plain language of Section 1319(g)(6)(A) dictates the sensible outcome that Appellants are not foreclosed from pursuing injunctive relief distinct from the state and local administrative enforcement activities.

This Court has not yet directly addressed this specific legal question, but the Tenth Circuit's decision in *Paper, Allied-Industrial* is instructive. The Tenth Circuit there held that section 1319(g)(6)(A) "bars only civil penalty claims and not claims requesting declaratory or injunctive relief." 428 F.3d at 1297-1300. In reaching its conclusion, the Court found the statutory language was "strong evidence that Congress did not intend to exclude equitable remedies when it enacted [section] 1319(g)(6)(A)(ii)." *Id.* at 1298-99.[6] Specifically, the Court noted Congress used the words "civil action" in section 1365 authorizing citizen suits but chose the "narrower term 'civil penalty action'" in the diligent prosecution bar of section 1319. *Id.* at 1298. The Court determined civil penalties were "distinct" from other remedies available in a citizen suit, finding,

---

[6] *See* H.R. Conf. Rep. No. 1004, 99th Cong., 2d Sess. At 133 (1986) (stating "[t]his limitation applies only to an action for civil penalties for the same violations which are the subject of the administrative civil penalty proceeding" but would not apply to "an action seeking relief other than civil penalties (e.g., an injunction or declaratory judgment)").

> Congress explicitly grants jurisdiction to 'enforce' an effluent standard or limitation (by presumably issuing a declaratory judgment or an injunction) *and* to 'apply any appropriate civil penalties' (by assessing the appropriate fine). A strict reading of the statute, then, indicates that while [section] 1365 grants jurisdiction over all types of civil remedies, the limitation in [section] 1319 only strips jurisdiction with regard to the district court's ability to impose civil penalties.

*Id.* Additionally, the Tenth Circuit noted, "there is a separate jurisdiction-stripping provision for injunctive remedies"—"Section 1365(b)(1)(B) precludes *any* civil action when a State initiates *judicial proceedings* against a polluter." *Paper, Allied-Indus.*, 428 F.3d at 1298. However, "if a State only opts for *administrative* enforcement, then [Section] 1365(b)(1)(B) will not apply." *Paper, Allied-Indus.*, 428 F.3d at 1298 (emphasis added). Taken to the next stage of the analysis, if a State has commenced and is diligently prosecuting only an *administrative enforcement* proceeding, section 1319(g) would then bar only a citizen suit's claims for monetary penalties; section 1319(g) would *not* bar any injunctive relief sought by the citizen suit.

The Tenth Circuit's analysis is supported by the statutory language and appeals to common sense. Congress's determination that a formal legal action filed in court should have greater preclusive effect than an administrative enforcement action is sensible because of the increased judicial oversight of the proceedings. Moreover, the Act's legislative history reflects the pursuit of injunctive relief was

the predominant consideration in creating the citizen suit provision, which

strengthens the finding that monetary penalty claims would be more readily

precluded by less formal enforcement action. *See Gwaltney v. Chesapeake Bay*

*Found., Inc.*, 484 U.S. 49, 61-63 (1987)

In rejecting the Tenth Circuit's analysis, the District Court here relied on the

First Circuit's decision in *Scituate*. (J.A. at 17, n.12) The First Circuit there held

that section 1319(g)(6)(A) bars both civil penalty actions and injunctive relief

"[b]ased on both the policy considerations regarding civilian actions under section

[1365] emphasized by both the Supreme Court and Congress and the fact that

section [1365] fails to differentiate civilian penalty actions from other forms of

civilian relief . . . ." *Scituate*, 949 F.2d at 557. The Court relied heavily on the

following language in the Supreme Court's decision in *Gwaltney*:

> In contrast, section [1365] does not authorize civil
> penalties separately from injunctive relief; rather, the two
> forms of relief are referred to in the same subsection,
> even in the same sentence. The citizen suit provision
> suggests a connection between injunctive relief and civil
> penalties that is noticeably absent from the provision
> authorizing agency enforcement.

*Id.* (quoting *Gwaltney*, 484 U.S. at 58 (internal citations omitted)). The First

Circuit concluded this connection in the statutory language combined with the

supplemental role of citizen suits indicated section 1319(g)(6) bars "*all* citizen

actions brought under section [1365], not merely civil penalties." *Id.*; *see also*

*Arkansas Wildlife*, 29 F.3d at 383 (adopting the First Circuit's reasoning).

Returning to the decision in *Paper, Allied-Industrial*, the Tenth Circuit noted

serious flaws in the reliance on *Gwaltney*. The Tenth Circuit particularly

emphasized that while the Court in *Gwaltney* held that a "civil penalty may only be

sought when the citizen is also seeking injunctive relief," the Court did not address

the "mirror image"—whether a citizen suit may seek injunctive relief without also

seeking civil penalties. 428 F.3d at 1298-99 (citing *Gwaltney*, 484 U.S. at 59).

This distinction highlights the *Scituate* and *Arkansas Wildlife* courts'

misplaced reliance on *Gwaltney*. Significantly, the central issue in *Gwaltney*

related only to whether citizens could bring suits to enforce "wholly past

violations" and had nothing to do with whether citizen suits could pursue *only*

injunctive relief. 484 U.S. at 56. The language cited by the Eighth and First

Circuits was intended to address the argument that the use of the phrase "is in

violation" in both Sections 1319(a) and 1365(a) indicated citizens could similarly

seek redress of "wholly past" violations. *Id.* at 58-60. The Court's analysis in

*Gwaltney* is therefore an improper basis to reject the plain statutory language in an

entirely different context.

This Court should adopt the Tenth Circuit's reasoning in *Paper, Allied-*

*Industrial* and reverse the District Court's conclusion. The plain language of both

sections 1365(a) and 1319(g) demonstrate Congress's intent to limit citizen suits to only injunctive relief when a state or federal agency has commenced a diligent prosecution under an administrative enforcement scheme comparable to the CWA. As the Tenth Circuit correctly concluded, section 1365(b)(1)(B) already bars *all* citizen suits when the State initiates *judicial*, rather than *administrative* enforcement. *See Paper, Allied-Indus.*, 428 F.3d at 1298.

Here, the District Court erred in effectively applying Section 1365(b)(1)(B) instead of 1319(g)(6). *See Jones*, 224 F.3d at 521 (finding the district court "committed reversible error by according . . . a state *administrative agency* charged by the state legislature with supervising water quality, the status of a *court* of the United States or a State"). In the complaint, Appellants requested injunctive relief, monetary penalties under the Act, and actual and punitive damages. (J.A. at 47). Although Appellants also requested the imposition of monetary penalties, the complaint clearly demanded and envisioned injunctive relief to repair the damage caused by Arabella Farm's circumvention of the Act's requirements. As a result, Appellants' citizen suit claims for injunctive relief are not barred by the diligent prosecution provision contained in section 1319.

The District Court erred in finding Section 1319(g)(6) barred both monetary and injunctive relief, and thereby dismissing all of Appellants' claims. In the event

this Court concludes the diligent prosecution bar applies, Appellants respectfully request the reinstatement of its claims for injunctive relief.

## II.    The District Court erred in finding SCTU failed to comply with the notice requirements of the Clean Water Act citizen suit provision.

The CWA imposes a notice requirement on plaintiffs prior to filing suit:

> No action may be commenced . . . under subsection (a)(1) of this section . . . prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the [EPA] Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order.

33 U.S.C. § 1365(b)(1)(A). This Court has held that "compliance with the notice and delay provisions of [section] 1365(b)(1)(A) of the Clean Water Act is a mandatory condition precedent to the commencement of a suit under this Act." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 399 (4th Cir. 2011). Additionally, this Court held that compliance with the related regulation, 40 C.F.R. § 135.3(a), is a "mandatory condition precedent to filing suit under the Act." *Id.*

The notice must "include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated." 40 C.F.R § 135.3(a). "Notice given by a citizen plaintiff under the Clean Water Act thus must provide the alleged violator with enough information to attempt to correct the violation and avert the citizen suit." *Gaston*, 629 F.3d at 400. In

addition, the notice must include "the full name, address, and telephone number of the person giving notice." 40 C.F.R. § 135.3(a).

Citing failure to comply with these notice requirements, the District Court dismissed South Carolina Trout Unlimited as a plaintiff because "Trout Unlimited" was named in the notice letter. (J.A. at 19-20). The District Court concluded that the notice letter's failure to specifically list "South Carolina" Trout Unlimited, as opposed to Trout Unlimited, renders SCTU "not a proper party to this action." (J.A. at 19-20). In adopting this highly-technical interpretation, the District Court did not cite or discuss any authority relating to how the notice requirements applied to an organization with different chapters, like Trout Unlimited with hundreds of chapters nationwide. (J.A. at 19-20, 24-25, 63-64).

This Court has previously emphasized that "[a]lthough the notice requirements for citizen suits brought under the Clean Water Act are strict and specific, we nevertheless agree with the cautionary reasoning of other circuits warning against an overly technical application of regulatory notice requirements." *Gaston*, 629 F.3d at 399-400 (citing *Pub. Interest Research Group of N.J., Inc. v. Hercules, Inc.*, 50 F.3d 1239 (3rd Cir. 1995) and *Waterkeepers N. Cal. V. AG Indus. Mfg., Inc.*, 375 F.3d 913 (9th Cir. 2004)). The District Court's dismissal of SCTU represents precisely the "overly technical application" of the notice requirement this Court warned against. *Id.* Requiring the precise naming of an

organizational plaintiff in the notice letter and scrutinizing the slight rhetorical difference between an organization and one of its constituent parts is an exceptionally strict and formulaic interpretation of the regulatory requirements.

Moreover, the notice letter communicates that the South Carolina chapters of Trout Unlimited are subdivisions of the larger organization and their participation in the lawsuit advances the mission and goals of the larger organization in South Carolina. (J.A. at 63-64). In the notice letter, Trout Unlimited is identified as a "national non-profit organization" with "two local chapters in the Upstate of South Carolina, both which work toward maintaining water quality in rivers and tributaries that support trout populations and other recreational opportunities." (J.A. at 63). The letter further specified the Eastatoe River and the Little Eastatoe Creek as specific waterways protected and utilized by Trout Unlimited members in South Carolina. (J.A. at 63-64). These waterways are precisely the waterways detrimentally impacted by Arabella Farm's unlawful activities at issue in this action. (J.A. at 30-31, 33-35, 62, 70-71).

Taken together, the letter unequivocally communicated the roles of Trout Unlimited and the South Carolina chapters, which provided notice of their intent to sue for specific alleged violations of the Act caused by Arabella Farm's stormwater and sediment pollutant discharges from its land disturbance activities. (J.A. at 61-76). Furthermore, throughout the case, the same individual

representative listed in the notice letter has been the appropriate contact. (J.A. at 76). *See Natural Resources Defense Council, Inc. v Southwest Marine, Inc.*, 945 F.Supp 1330, 1333-34 (S.D. Cal. 1996) (finding notice was sufficient for individual plaintiff, who was also the executive director of one of the organizational plaintiffs because he signed the letter, remained the executive director, and the letter provided "defendants or regulators information regarding with whom they needed to negotiate").

Accordingly, SCTU adequately informed Arabella Farm of its intent to sue, including "sufficient information to permit [Arabella Farm] to identify the specific standard, limitation, or order alleged to have been violated" and "enough information to attempt to correct the violation and avert the citizen suit." *Gaston*, 629 F.3d at 400-01; *see also Paolino v. JF Realty, LLC*, 710 F.3d 31, 34 (1st Cir. 2013) (holding pre-suit requirements are satisfied when "the information contained in pre-suit notice identifies the potential plaintiffs, provides basic contact information, and allows the putative defendants to identify and remedy the alleged violations"). The District Court erred in finding SCTU failed to comply with the citizen suit notice requirements, and SCTU respectfully requests this Court reverse the dismissal of its claims.

**III. The District Court erred in declining to exercise supplemental jurisdiction over the related state-law claims based on its erroneous conclusion that it lacked subject matter jurisdiction on the Clean Water Act claims.**

Under federal question jurisdiction, a district court "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Act's citizen suit provision provides "federal question" jurisdiction provided all of its requirements are satisfied. 33 U.S.C. § 1365. "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a).

The District Court declined to exercise supplemental jurisdiction over Naturaland Trust and Upstate Forever's related state-law claims because it had dismissed the CWA claims, eliminating its basis for original jurisdiction. *See* 28 U.S.C. § 1367(c)(3) (authorizing a district court to decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction").

Naturaland Trust and SCTU satisfied the notice requirements for a citizen suit and no state or federal agency has commenced and was diligently prosecuting an administrative enforcement action under a scheme comparable to the Act. As a

result, Naturaland Trust and SCTU established federal question jurisdiction and the

District Court improperly dismissed the citizen suit and improperly declined to

exercise supplemental jurisdiction over the related state-law claims asserted by

Naturaland Trust and Upstate Forever.

Naturaland Trust and Upstate Forever alleged four state-law causes of

action: (1) private nuisance, (2) public nuisance, (3) trespass and continuing

trespass, and (4) negligence and gross negligence. (J.A. at 40-47). Each of these

causes of action directly relate to Arabella Farm's mismanagement of sediment-

laden stormwater discharges caused by its land disturbance and construction

activities and the resulting harm suffered by Naturaland Trust and Upstate

Forever's property interests. (J.A. at 40-47). Because these claims arise from the

same set of facts forming the Clean Water Act citizen suit, they "are so related to

claims in the action within [the District Court's] original jurisdiction that they form

part of the same case or controversy." (J.A. at 36-47); 28 U.S.C. § 1367(a); *see*

*also Hinson v. Norwest Financial South Carolina, Inc.*, 239 F.3d 611, 615 (4th Cir.

2001) ("[W]hether the federal-law claims and State-law claims are part of the same

case is determined by whether they 'derive from a common nucleus of operative

fact' and are 'such that [the plaintiff] would ordinarily be expected to try them all

in one judicial proceeding.'" (quoting *United Mine Workers of America v. Gibbs*,

383 U.S. 715, 725 (1966))). Both the federal claims asserted under the Clean Water

Act and the state law claims arise from Arabella Farm's actions causing discharges of sediment-laden stormwater into waters of the United States, which caused harm to Naturaland Trust and Upstate Forever's property interests. (J.A. at 36-47). As a result, both sets of claims satisfy the requirement that they "derive from a common nucleus of operative fact" and are "such that [Naturaland Trust and Upstate Forever] would ordinarily be expected to try them all in one judicial proceeding." *See Hinson*, 239 F.3d at 615.

In light of the original jurisdiction established by the citizen suit, section 1367(a) grants the District Court supplemental jurisdiction unless one of the four exceptions authorizing it to decline to exercise jurisdiction applied. *See* 28 U.S.C. § 1367(c). The District Court relied on the third exception; however, its dismissal of the federal claims was erroneous for the reasons set forth above and should be reversed. (J.A. at 20). If this Court reverses the dismissal of the Clean Water Act claims, the foundation for dismissal of Naturaland Trust and Upstate Forever's state-law claims no longer exists and the claims should be reinstated.

Naturaland Trust and Upstate Forever respectfully request the reinstatement of the state-law claims because Appellants have established original jurisdiction in the district court and the state-law claims are appropriate for consideration under supplemental jurisdiction.

## CONCLUSION

Appellants respectfully requests that this Court reverse the District Court's rulings that (1) DHEC and Pickens County commenced and were diligently prosecuting an administrative enforcement action under a scheme comparable to the CWA, (2) SCTU failed to comply with the citizen suit notice requirements, and (3) declined to exercise supplemental jurisdiction over the related state-law claims based on its error regarding the diligent prosecution bar. Appellants additionally request this Court remand the matter to the District Court for further proceedings.

## REQUEST FOR ORAL ARGUMENT

As this case involves significant novel questions in the Fourth Circuit, Appellants respectfully request oral argument.

Respectfully submitted,

s/ Michael G. Martinez
Michael G. Martinez (SC Bar No. 101800)
Amy Armstrong
Lauren Milton
S.C. ENVIRONMENTAL LAW PROJECT
407 Church Street, Unit E
Georgetown, South Carolina 29440
(864) 527-0078
Mike@scelp.org
Amy@scelp.org
Lauren@scelp.org
*Attorneys for Appellants*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B) because:

   [X] this brief contains 12,936 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)95) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because:

   [X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

s/ Michael G. Martinez
Michael G. Martinez (SC Bar No. 101800)
S.C. ENVIRONMENTAL LAW PROJECT
407 Church Street, Unit E
Georgetown, South Carolina 29440
(864) 527-0078
Mike@scelp.org
*Attorney for Appellants*

October 22, 2021

# CERTIFICATE OF SERVICE

I, Michael G. Martinez, hereby certify that on this 22nd day of October

2021, I filed the foregoing document electronically with the Clerk of the Court

using the CM/ECF System, which sends notice of such filing to the following

registered CM/ECF users:

Elizabeth Bartlett Partlow
Law Offices of Elizabeth B. Partlow LLC
1800 Platt Springs Road
West Columbia, SC 29169
Beth@partlowlaw.com

Adam B. Lambert
Acker Lambert Hinton PA
P.O. Box 9
859 Pendleton Street
Pickens, SC 29671
Adam@alhfirm.com

*Counsel for Appellees Dakota Finance LLC, Ken Smith, Sharon Smith, and
Willard R. Lamneck, Jr.*

s/ Michael G. Martinez
Michael G. Martinez (SC Bar No. 101800)
S.C. ENVIRONMENTAL LAW PROJECT
407 Church Street, Unit E
Georgetown, South Carolina 29440
(864) 527-0078
Mike@scelp.org
*Attorney for Appellants*